Good morning ladies and gentlemen. The first case this morning is Pontinen v. United States Steel Corporation. May it please the court, your honors, my name is David Strube and I represent appellant Russell Pontinen with respect to his claim against U.S. Steel for violation of the Americans with Disabilities Act after U.S. Steel rescinded his offer of employment after he disclosed that he had suffered three or four seizures in his life. The matter before you today is appeal of the district court's March 9, 2021 order granting U.S. Steel's motion for summary judgment wherein the district court held that U.S. Steel did not violate the ADA because Pontinen's employment with U.S. Steel would have posed a direct threat to the health and safety of himself and his coworkers. Your honors, I contend that the district court's ruling constitutes reversible error and the key to my contention, what overlays all aspects of this case, is that the ADA requires that an employer's analysis of whether an employee's medical condition would pose a direct threat must be based on the best available objective medical evidence and an expressly individualized assessment of this specific applicant. Mr. Strube, what is the relationship, if any, between the qualified individual element of the claim and the direct threat defense? Sure, Judge. I think that once Mr. Pontinen submitted a medical clearance from his neurologist that Mr. Pontinen and ourselves met our prima facie burden that he was qualified. I believe the burden then shifted to U.S. Steel to prove that Dr. IATA's clearance was either wrong or provide its own medical evidence refuting his clearance to satisfy their burden to demonstrate that he would have posed a direct threat. Can you base that on the fact that they're laid out in separate statutory subsections? Yes, and I believe the holding in Branham v. Snow, I believe a 2014 Seventh Circuit case made clear that the direct threat is a defense that the employer must carry. At the end of the day, the way I read our case law is to look at the employer's decision and determine whether or not the decision is objectively reasonable. Is that right or am I wrong on that? I think you're right, Judge, but I think it must be objectively reasonable at the time it's made, and I think that's a critical distinction because it goes into the mindset of the decision makers. So, for example, I think the district court erred when it considered the testimony and the opinion of Dr. Mark Gardner, who opined six months later that Mr. Pontinen's employment would have posed a direct threat to the safety of his coworkers. Dr. Gardner wasn't employed by U.S. Steel at the time. Dr. Gardner played no role in the imposition of the medical restrictions, which ultimately disqualified Mr. Pontinen from employment. So, when we're talking about objective evidence, I think we need to limit it to what went into the decision at the time that the medical restrictions were imposed. But wasn't Dr. Gardner looking back with his testimony, at least the way I viewed it, was looking back in time to say at the time the decision was objectively reasonable? In other words, in civil litigation, when civil litigation is filed, we don't freeze the testimony and things like that. Often, parties will hire experts and things of that nature to look back and say at the time of the event in question or at the time of the event being litigated, these were the facts and this is my opinion based on those facts. Is that not what happened here? I believe that is what happened and I believe that a jury could take into account Dr. Gardner's opinion, but I think a jury would also have to weigh Ms. Jennifer Notovus, the nurse practitioner that imposed the restrictions, and what went into her thought process and her decision making when she admittedly formulated in her mind what the restrictions would be before she even had access to Mr. Pontinen's medical records. If the test, though, is objective reasonableness, isn't that putting a lot, taking a lot away from the employer? In other words, what we've got here is a situation where an employee, clearly your client has suffered from seizures in the past and clearly he's sought to do what I would consider to be relatively dangerous work, not only to himself but to others. And I guess at what point should we consider the employer's decision to be sort of the final say if we're looking at this under an objective reasonableness test? I think you have to compare what Ms. Notovus had at her disposal at the time she made that determination that restrictions were necessary. Because on the one hand, we have a medical clearance from the neurologist that was treating Mr. Pontinen for four years that had agreed to wean him off medication after almost three years of being seizure free. And that three months after he was weaned off and submitted Mr. Pontinen to a new EEG, opined that he can work with no medical restrictions. On the other hand, we have the opinion of Ms. Notovus who admittedly had never done a fitness for duty examination from an applicant who had suffered a seizure. And we have no further corroborating medical testimony from a doctor or a neurologist explaining why Dr. Ada's medical clearance was in any way deficient. I would say the onus at that point would have been on U.S. Steel to contact Dr. Ada and ask why is it that you agreed to wean Mr. Pontinen off? Why is it that you feel that he can work with no restrictions? And if possible, perhaps ask Mr. Pontinen to agree to a third independent medical examination. Instead, what they did was just completely disregard Dr. Ada's medical clearance and concluded that his condition was uncontrolled. And frankly, read negative inferences into his medical records that I don't think are there. It's very easy to cherry pick words from his medical records such as it's his decision to go off the medication. But when you look at the records holistically, you see a three to four year treatment plan. And to equate that, to equate being unmedicated with being uncontrolled, I think is a very dangerous proposition. And the reason for that is because the sole consideration the district court based its conclusion on that Mr. Pontinen's seizure disorder was uncontrolled was that he was no longer on medication. Such a conclusion, I submit, runs afoul of the ADA because it's premised on the belief that if anyone has ever had a seizure, they need to be medicated. And that's the exact opposite of an individualized assessment. I think you're required and an employer is required to look at the number of seizures, the duration of the seizures, the nature of the seizures, whether there were warning signs, as Mr. Pontinen testified to about his two seizures, wherein he had 30 seconds to a minute to get himself to a safe place to avoid any injury. So the district court's conclusion that Mr. Pontinen was unmotivated to treat his condition, I think highlights the categorical discrimination that could result if an employer is permitted to conclude that unmedicated means untreated. And I think once the district court concluded that the seizure disorder was uncontrolled, it irreparably tainted the entire direct threat analysis. By the district court's own admission, it evaluated all four factors, the duration of the risk, the nature of the risk, the likelihood of harm, and the imminence of harm through the lens that the condition was uncontrolled. And if this matter were to be remanded for a jury trial, as I believe it should, the jury could reach a different conclusion where its analysis is not based on, not premised on, the misconception that his seizure disorder was uncontrolled. I think the district court also wrongfully concluded that Pontinen's comments to Ms. Notovas during the fitness for duty examination, that he was no longer taking Depakote, on their own justified a direct threat finding. Number one, the district court failed to cite any specific comments that Mr. Pontinen made that would justify a direct threat finding based only on those comments, whereas a review of the record paints a much different picture. Pontinen recalled that he and Ms. Notovas only briefly discussed his prior seizures. They had no discussion about the process of being weaned off the medication. They had no discussion about the warning signals that preceded Mr. Pontinen's seizures. And instead, Mr. Pontinen recalls that during the examination, Ms. Notovas implied that he decided to go off the medication on his own. On the other hand, Ms. Notovas has been unable to recall what Mr. Pontinen said to her that led her to conclude, as she wrote on the health inventory form, stopped Depakote without neurologist's approval. The district court's conclusion that these statements were irrelevant, which is on page 16 of the district court's opinion, I think constitutes significant error. I submit that no one's testimony in this case is more important to the issue of whether Mr. Pontinen was afforded an individualized assessment than those of Ms. Notovas. She's the only U.S. Steel medical personnel that evaluated and examined Mr. Pontinen at the time the decision was made. She's the individual that imposed the restrictions, and she testified unequivocally that the medical restrictions imposed on Pontinen were necessary because he was no longer on medication. But yet she also made the critical admission that she would have imposed the same restrictions had he remained on Depakote continuously. He hadn't had a seizure since 2014? Correct, Your Honor, June and August of 2014. By not even addressing the contradictory statements that Ms. Notovas made, the district court's conclusion that U.S. Steel engaged in an individualized assessment is inherently flawed. Mr. Strube, there's a lot of discussion and debate in the case on the second element and then the affirmative defense, and in defense of the lawyers here, our law has not been perhaps as clear as it could have been with regard to that distinction. What evidence do you rely on on the third element to preclude summary judgment? That seems to have gotten shunted off in some of the discussion. So directing your attention to the third element. To the but-for element? Correct. Judge, I think it's quite clear that but for the medical restrictions, the work restrictions that were imposed, he certainly would have been employed by U.S. Steel. That's a conclusion. Tell me the evidence that precludes summary judgment on that. Well, so he was given a conditional offer of employment. The last remaining factor was that he sufficiently completed a fitness for duty examination, and in connection with that fitness for duty examination is what led Ms. Notovas to impose the five work restrictions on the form, the health inventory form that we see. When Ms. Notovas then gets the blessing of her superior, Dr. Norman, for the appropriateness of those five restrictions and turns it into HR, that disqualified him from employment. So I think there's a direct link between the imposition of those five work restrictions and the rescission of his offer of employment. Okay. You can continue. Your Honor, the district court also committed reversible error when it concluded that U.S. Steel was justified in disregarding Dr. Ada's medical clearance. It's undisputed that after his fitness for duty examination, Mr. Putnam did exactly as requested by U.S. Steel. He took the form that he was given to his neurologist. He underwent a new EEG that showed clean results and no abnormalities and took it back to U.S. Steel. And despite this clearance, Ms. Notovas, at the end of the day, imposed the identical restrictions on him that she concluded were necessary long before she had even been provided any medical records. At the absolute minimum, the conflicting opinions of Dr. Ada and nurse practitioner Notovas create a genuine issue of material fact that falls within the purview of the jury. District court can't resolve these two conflicting reports at the summary judgment stage. Your Honors, I think it's also reversible error for the district court to justify U.S. Steel's rejection of the medical clearance based on the Department of Transportation regulations. That's a red herring. The Department of Transportation regulations do not apply to U.S. Steel. U.S. Steel is not bound by those regulations. But more importantly, U.S. Steel has cherry-picked which regulations to apply. It wants to apply the regulations that you have to be 10 years seizure-free or 3 years seizure-free on medication, but as Dr. Gardner explained, it doesn't afford or apply the Department of Transportation regulations that would have given Putnam an appeal right to say, hey, wait a second, my doctor's concluding something different than your medical department. I want an independent medical examination. I want to explain why, on an individual basis, I should not be disqualified from working here. Frankly, by relying on the DOT rigid regulations instead of its own individual assessment, I think U.S. Steel is tacitly undermining their own position that they did perform an individualized assessment. Every time they're confronted with disputed facts, they fall back on the DOT regulations. So I would ask this court to reject that justification and find it as nothing but a red herring. What would be the ultimate jury question in this case if this was submitted to a jury? Whether or not Mr. Putnam's employment at U.S. Steel would cause a direct threat to the health and safety of himself and his coworkers, and I think it would have to weigh the credibility. But that's not quite right, right? It would be whether or not U.S. Steel's decision to deny him employment was reasonable. Is that right? Is my jury question better than yours, or is yours better than mine? Yours is better than mine, but I would say not just reasonable, but also based on objective medical evidence and an individualized assessment. I guess what I'm having a hard time here is there's conflicting medical evidence, right? There's conflicting medical evidence here. Is the jury supposed to weigh the medical evidence to determine whether or not U.S. Steel's decision was objectively unreasonable? Yes, and I think no case highlights that better than Stratagepede v. City of Evanston, 865 F. 3rd, 861, 7th Circuit, 2017. In that case, the jury was confronted, or I apologize, the trial court resolved conflicting medical opinions, and on appeal it was determined that's not appropriate. That's within the purview of the jury. It is up for the jury to decide which medical expert they believe, which they find credible, and which, at the end of the day, they believe is best representing whether the applicant or employee poses a direct threat. Thank you. Thank you. Mr. Torbek? Thank you. Good morning, and may it please the court. My name is Rod Torbek. I'm here on behalf of the United States Steel Corporation, and we are asking this court to affirm the district court's decision to grant summary judgment to United States Steel on Mr. Pontonin's disability discrimination claim. Mr. Pontonin does not have a viable disability discrimination claim because he failed to prove the prima facie burdens to continue with that claim, namely that he was not a qualified individual with a disability. Mr. Torbek, same question as I posed to Mr. Strube. What's the relationship between the qualified individual element and the direct threat defense? Well, there's some overlap there, Your Honor, admittedly, but there is a burden on the plaintiff in these cases to first demonstrate that they meet both the technical, any educational, technical, and physical abilities to perform the essential functions of that job. And what makes this case unique in that it doesn't immediately go just because he got a job offer to then the direct defense, direct threat defense for U.S. Steel is, in this case, U.S. Steel follows guidelines for individuals that operate mobile equipment. And during the physical exam, when they learned that Mr. Pontonin had a history of seizures and had what was under the medical community is defined as an active seizure history in that he's had them within the past five years, then under the regulations that U.S. Steel adopted, and the employers are allowed to adopt such regulations to preserve a safe work environment. And Judge Kirsch is exactly correct. This is a dangerous work environment, or can be, if you don't have people that have their capabilities and their whereabouts, and in this case can suffer seizures. So what we are arguing in this case is before you even get to the direct defense, direct threat defense, plaintiff had to demonstrate that he met those qualifications, and he could not do that given the fact that he wasn't seizure-free for 10 years. Now, it was incumbent upon him, if you wanted to question that, to show they're arguing that it was selectively applied for cherry pick, but there's no evidence of that. The evidence in this record shows that United States Steel Corporation applies that standard across the board to individuals that operate mobile equipment, and for good reason. This is a standard that was set forth by a federal governmental agency, and presumably it's objectively reasonable because it applies namely to commercial truck drivers, but U.S. Steel is entitled to follow those guidelines because of the inherent dangers that exist in a steel mill. And when you have individuals working around chemicals, and in his case he would have been operating a crane or driving mobile equipment or around heavy machinery, working with torches, and you have chemicals and gases and other utilities in that workplace, it's an objectively reasonable standard for U.S. Steel to apply that. If he were able to show that, Your Honor, and there's no way he can, then you get to the direct threat defense, and in this case U.S. Steel has demonstrated, based upon the uncontested facts in the record, that Mr. Ponton opposed a threat to the safety of himself and coworkers if he would have been hired as a utility person at Midwest. And in defense of the attorneys, again, I don't think our law has been as clear as it perhaps could be, but I'm wondering whether there's a conflation here of the phrase from the second element, otherwise qualified, with the concept of qualification standards, because those two are not precisely the same concept. One is an element of the claim. The other has been imported for purposes of setting the standard. So there's a lot of discussion on this second element and the affirmative defense, and that discussion has been conflated, and I take it you've laid out your position with regard to a distinction between evidence that's been proffered for purposes of the summary judgment on the second element versus a discussion on the affirmative defense. Well, we've done both. We've laid it out in both ways. We've proffered a discussion on the first part that he's unable to show that he's a qualified individual, that he meets the qualifications for the job with or without accommodation. And then to the extent you find differently, we've also argued that U.S. Steel has proven its affirmative defense that he would pose a threat to the safety of himself and others in the workplace if he were hired, and therefore he's not qualified to work there. Now, the facts in this case were undisputed in terms of the essential functions of the job and also the inherent safety risks that one would be exposed to if he were brought in to work as a laborer in the steel mill. I've already laid out the safety conditions that he would be exposed to. He would be required to work with hand tools, work at elevated heights, either be around or operate heavy equipment, would operate cranes, would operate mobile equipment. In terms of his medical condition, that was uncontested as well. He has a history of seizures. He's had four in his lifetime. Seizures, it was uncontested or unpredictable, can come at any time. Mr. Pontnet acknowledged that. He acknowledged that even though he's had warnings on occasion, there's no guarantee that he will have those in the future. His doctor adamantly stated, Dr. Ada adamantly stated in the medical records, that he stands to be at greater risk of having additional seizures in the future because of his history of seizures and his sister has had a history of seizures. It is also clear from the medical records that Nurse Notovis and Dr. Norman both examined, when they received that information upon their request, that Dr. Ada recommended that Mr. Pontnet stay on the medication for treatment, the anti-seizure medication, the Depakote. And it's clear that despite that recommendation, it was only upon Mr. Pontnet's insistence that eventually Dr. Ada weaned Mr. Pontnet off that medication. Mr. Pontnet has admitted that in his deposition as well. The opposing counsel suggested that U.S. Steel could have called Dr. Ada to find out more about it, but Mr. Pontnet has already admitted in this record that it was upon his insistence that the doctor remove him from that medication. Dr. Ada had warned him of the greater risk in the future of having another seizure, particularly when he's not on medication. Those facts are all uncontested. A plaintiff's counsel argued that there's evidence in the record that Mr. Pontnet's medical condition was controlled. There's no such evidence in this case. The medical records that were provided in the summary judgment record, as the district court reviewed them, clearly indicate that there's no evidence of his medical condition being controlled. If they wanted to reach that medical conclusion, they could have provided an affidavit from Dr. Ada or some other medical expert to do so. But there is no such evidence in this case for that conclusion to be reached. The medical records, again, make it clear that he stood to be a greater risk in the future, particularly when he's not off medication. And he had just come off medication, the anti-seizure medication, three months prior to the physical exam at United States Steel. Did any of the tests at the May 2017 Fitness for Duty exam pertain particularly to Mr. Pontnet's seizure disorder? Not in any way other than through the interview with him, Your Honor. And through the interview with him, the nurse took down notes that he had a history of four seizures. She wrote down that he went off of it against his doctor's recommendation. And then they sought further information on him. This was not a categorical rejection of him at that moment. They sought further information from him, from his doctor, and, in fact, brought him in on one or two occasions to get the forms necessary for that further information. All evidence to show that they gave him the individualized assessment. And then when the information arrived, the testimony in the case reflects that Nurse Notovis conferred with the plant physician, Dr. Norman, and they reviewed the conversations that the nurse had with Mr. Pontnet on the day of the exam. They reviewed his medical notes. They consulted with the guidelines from the Department of Transportation that U.S. Steel imposes upon individuals that operate mobile equipment. And they reached an objectively reasonable medical determination after an individualized assessment based upon the best medical evidence available to them in this case. The medical community that Dr. Norman had introduced into evidence recommends that individuals with an active seizure disorder be treated for medication for at a minimum of five years. So that, again, went in uncontested. And that is something that Dr. Norman used during his decision, I'm sorry, her decision in imposing these restrictions on Mr. Pontnet. Judge Kirsch, the standard that you've indicated today, I agree, is the correct standard. The court's duty here today, if you get past the prima facie element and focus only on the direct threat defense question, is whether U.S. Steel's decision was objectively reasonable with the evidence that they had at that time. And you can have conflicting opinions from doctors, and an employer is entitled to rely upon its own doctor's recommendation, in this case particularly with the restrictions imposed, and the nature of the job that Mr. Pontnet was going to perform, and rely upon those recommendations from its doctors and still reach a legitimate decision here. And this was based on safety. There's been no other evidence to the contrary or that created a genuine dispute of material fact in this case. And we ask this court to affirm the decision, again, of the district court that granted summary judgment in favor of U.S. Steel. Thank you. Thank you, Counsel. Thank you. Thank you, Your Honors. Counsel suggested that Dr. Ada's decision to wean Mr. Pontnet off Depakote was only upon Mr. Pontnet's assistance. I don't believe that's supported by the record. Mr. Pontnet unequivocally testified that he would not have gone off medication without his neurologist's approval. In fact, the doctor's notes show that he requested to go off the medication in February of 2016. Dr. Ada said no, stay on it for another year. And he asked again in February of 2017, at which point Dr. Ada agreed to wean him off. This notion that Dr. Ada only did so at the assistance of Mr. Pontnet is troubling because it essentially removes any agency from Dr. Ada. It construes his decision and his records as being forced to abide by a patient's wishes. If Dr. Ada didn't wish him to be off the medication, he was not forced to write a prescription to reduce the dosage from 1,500 milligrams to 1,000 milligrams to 500 milligrams. And when he did so, the notes reflect he was only going to continue to reduce the medication if he remained seizure-free. Now, even after he was off the medication, he cleared him to work three months later. If he was that against going off the medication and only did so at the assistance of Mr. Pontnet, he would not have cleared him to work with no restrictions. Now, counsel also asks, why didn't we submit an affidavit of Dr. Ada? And my answer would be because we have better than that. We have his medical clearance contemporaneous with this issue. We have his medical clearance, his EEG and his notes from May of June of 2017. An affidavit now, merely affirming what he said back then, provides no additional weight or probative value than what we have then. And more importantly, the direct defense burden is on U.S. Steel. If U.S. Steel is going to hang its hat on discrediting Dr. Ada, perhaps it could have deposed Dr. Ada and clarified why he agreed to wean Mr. Pontnet off medication. But I'll leave it with this. The fact that we're even up here debating what Dr. Ada's medical notes mean and what went into his mindset of clearing him to work with no restrictions, only further demonstrates that this is a genuine issue of material fact. And it's the key issue of material fact in this case that a jury must decide. And that is, was Dr. Ada's medical clearance appropriate or was U.S. Steel justified in relying on Ms. Notovis' imposition of onerous work restrictions that disqualified him from employment? Thank you. Thank you, Your Honors. Thank you. Thanks to both counsel and the case will be taken under advisement.